GRAHAM & MARTIN, LLP
Anthony G. Graham (State Bar No.148682)
Michael J. Martin (State Bar No. 171757)
3130 South Harbor Boulevard, Suite 250
Santa Ana, California 92704
(714) 850-9390

Attorneys for Plaintiffs
NOEL G. LESLEY SR.
AND DEBRA L. LESLEY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOEL G. LESLEY SR. AND DEBRA L. LESLEY, <br><br> Plaintiffs, <br><br> vs. <br><br> OCWEN FINANCIAL CORPORATION; OCWEN LOAN SERVICING, LLC; BANK OF AMERICA, NATIONAL ASSOCIATION; LITTON LOAN SERVICING LP, AND DOES 1-10, <br><br> Defendants. | CASE NO. 8:12-cv-01737-DOC-JPR <br><br> **PLAINTIFFS OPPOSITION TO MOTION TO DISMISS VERIFIED SECOND AMENDED COMPLAINT.** <br><br> Date: June 24, 2013 <br> Time: 8:30 a.m. <br> Ctrm.: 9D <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs NOEL G. LESLEY SR. AND DEBRA L. LESLEY hereby opposes the motion to dismiss of defendants OCWEN FINANCIAL CORPORATION, OCWEN LOAN SERVICING, LLC, and LITTON LOAN SERVICING LP.

I. **INTRODUCTION AND SUMMARY OF ARGUMENT**

Defendants make three intentionally misleading arguments in support of their Motion. Each is equally invalid.

First, Defendants state that "plaintiff has not provided evidence of a mutually agreed upon contract that represents a sufficient meeting of the minds between parties on all points." Motion, p. 1. Wrong. Every term of the agreement is set forth in detail in the complaint, as well as the mutual obligations of the parties. Plaintiffs were provided, as part of a settlement of their earlier action, a Trial Loan Modification Agreement signed by the attorney for Defendant Litton. Plaintiffs Verified Second Amended Complaint ("SAC"), ¶¶ 13-22 and Exh. A thereto. Defendants promised in writing that once Plaintiffs had fully complied with the terms of the Agreement they would be provided a loan modification on the same terms. SAC, ¶13. The written Trial Loan Modification Agreement **expressly** states as follows:

> Litton Loan Servicing LP ("Litton"), as sub-servicer of the above-referenced subject loan, **has received** the necessary authorization from Bank of America, the master servicer, **to proceed with a loan modification**. Provided Mr. and Mrs. Lesley make three trial modification payments of $1,900.37 due April 1, 2011, May 1, 2011, and June 1, 2011, and pursuant to such terms to be set forth in a release agreement re Mr. and Mrs. Lesley's claims, **a loan modification will follow**. [emphasis added]

There is no ambiguity as to what the new loan would be. "The Loan Modification Agreement sets forth in detail the financial component of the loan modification, that is, the new interest rate of 2.18% and the new payment amount of $1649.60 (P&I). The Loan Modification Agreement concluded "Please provide Mr. and Mrs. Lesley's approval so **we may prepare the documentation to memorialize the parties' agreement**." The letter is signed by Defendants Litton's and Bank of America's counsel Joan Spaeder-Youngkin of Roup & Associates." SAC, ¶15. Plaintiffs provided written approval of the agreement on February 15, 2011. *Id.* That same day "Ms. Spaeder-Youngkin [counsel for Defendants] agreed Defendants had to **and would** prepare a simple mutual release of claims to avoid any need for litigation and that she would do so "shortly"." *Id.* It is undisputed that Plaintiffs made the necessary trial payments and maintained further payments in trust as agreed by Defendants. *Id.*, at ¶17-18. This fulfilled Plaintiffs condition precedent to finalization of the Loan Modification

Agreement. The Trial Loan Modification states that "Once trial modification payments are made, **the modification can be finalized.**" SAC, Exh. A, p. 1.

All that remained to be done was the agreed preparation by Defendants of a release in the form already used for the four prior Plaintiffs with whom Defendants had settled. "Counsel spoke again on February 16, 2011 and agreed that the "documentation to memorialize the parties' agreement" would be (a) a new loan and deed of trust to be prepared by Litton reflecting the new financial terms agreed upon in the Loan Modification Agreement and with all other terms remaining the same as the original Note and Deed of Trust, and (b) a settlement agreement and mutual release of claims. Counsel for both parties agreed that the settlement agreement and mutual release of claims would be on **precisely** the same terms as **already provided** for each of the Plaintiffs in the earlier consolidated action by Defendants. The Release would specifically and precisely follow the earlier Releases already signed, other than putting in Plaintiffs names, address, loan number, and the new interest rate and new payment amount already identified. Both counsel agreed that the Release should be finalized within a few weeks." SAC, ¶16.

As set forth in detail in the SAC, it has been Defendants failure to complete its obligation under the agreement to provide the simple release and loan documents. "Between March 2, 2011 and April 16, 2011 counsel for Plaintiffs on a weekly basis wrote to Litton's counsel requesting the documents be finalized. These requests are in writing. On every occasion Litton's counsel confirmed both that the loan modification had been agreed and that she was "preparing the documents". She asked that counsel for Plaintiffs wait until the three payments had been made. He agreed." SAC, ¶19. "On May 27, 2011, Counsel for Litton contacted Mr. Graham and informed him **in writing** that all penalties and attorneys' fees added to the principal balance (almost $100,000) had been **waived** by Litton." *Id.*, ¶20. "On July 1, 2011, after **four** payments had been timely made, Plaintiff's counsel requested that counsel for Defendants "prepare the documentation to memorialize the parties' agreement." Thereafter Plaintiff's counsel contacted by email Ms. Spaeder-Youngkin demanding the final documents on July 7, 13, 14, 28, August 4, 9, 10, September 1, 14, 25, October 5, 18, November 7, November 23, December 6, and 29, 2011, January 18, 26, February 1 and 2,

1. 2012. On every occasion Defendants Litton's and Bank of America's counsel, Joan Spaeder-
2. Youngkin of Roup & Associates, responded and agreed in writing that she was "preparing" the
3. necessary documentation, which in this case was a simple settlement agreement with mutual
4. releases and the new loan documents, which of course **only Defendants could draft.**" *Id.*, ¶21.
5.     Under the Loan Modification Agreement, the **ONLY** stated requirements are (a) three
6. timely payments by Plaintiffs, (b) approval of the agreement by Plaintiffs, and (c) preparation of
7. a mutual release agreement by Defendants to be signed by the parties. Once approval was
8. provided by Plaintiffs (on February 15, 2011) and the three timely payments were made,
9. Defendants had the obligation to finalize the documents – "**we [will] prepare the**
10. **documentation to memorialize the parties' agreement.**" At that point the sole remaining
11. condition was the preparation of the "documentation to memorialize the parties' agreement"
12. which Defendants Litton and Bank of America had expressly agreed they would prepare.
13. Defendants simply never did what they had agreed to do under the Agreement.
14.     These undisputed allegations adequately set forth a cause of action for breach of contract
15. and breach of the implied covenant.
16.     Second, contrary to Defendants assertions, Plaintiffs have sufficiently alleged a fraudulent
17. business practice, in that the offering of a loan modification without the intent to ever complete,
18. while requiring the ongoing payment of a false "trial period" plan, amounts to a violation of
19. Business & Professions Code section 17200. "A practice is "fraudulent" if members of the
20. public are likely to be deceived. *Committee on Children's Television, Inc. v. Gen'l Foods Corp.*
21. 35 Cal.3d 197, 211 (1983). In addition, as to any statutory violation, Plaintiffs can allege there
22. was and currently is an ongoing violation of the California Home Owners Bill of Rights. Further,
23. the conduct described in the complaint clearly amounts to "immoral, unethical, oppressive [or]
24. unscrupulous" conduct.
25.     Finally, as to Plaintiff emotional distress claim, Defendants casually state that "Plaintiffs
26. claim is solely based on a denial of a mortgage modification." Actually, it is not the denial, but
27. the manner in which Defendant informed a grieving mother that her dead child's death was of no
28. consequence and was not "a hardship" which forms the basis of the claim. Moreover,

1  Defendants also state that Plaintiffs "do not allege that defendants knew they were especially
2  vulnerable or used a position of power to cause the plaintiffs' emotional distress." Motion, p.
3  Wrong. Plaintiffs state that Defendants knew they were grieving parents. Even this court should
4  agree this made Plaintiffs especially vulnerable. As to whether Defendants were' in a position of
5  power", and thus enabled to cause Plaintiff's emotional distress – Plaintiffs had just lost their
6  child and the bank was telling them they were also going to lose their home because his death
7  and the enormous costs associated with Plaintiffs efforts to keep him alive, were irrelevant and
8  "did not amount to a hardship." It is hard to imagine a more cruel and malicious action, taken
9  with full knowledge of all the facts. As to the issue of duty, Defendants simply ignore the fact
10 that they accepted the duty to provide a loan modification and to act in good faith when they so
11 stipulated before the Hon. Thierry Colaw in open court that they would do so. SAC, ¶ 9.
12     For all the above reasons, Defendant's Motion should be denied, or alternatively
13 Plaintiffs should be given leave to amend, if the court deems this necessary.
14     II.    FACTS
15     Plaintiffs herein previously filed an action on December 13, 2008, in Orange County
16 Superior Court, case number 30-2008-00116811, against Countrywide Home Loans, Inc. (the
17 originator Plaintiff's home loan) and Litton Loan Servicing, LLC (later discovered to be sub-
18 servicer for primary servicer Bank of America, National Association) alleging causes of action
19 for breach of contract, breach of the covenant of good faith and fair dealing, violations of
20 Business and Professions Code 17200, later amended to include causes of action for negligent
21 and intentional infliction of emotional distress. Defendant Litton has at all times refused to
22 disclose the identity of the current owner of the promissory Note or the identity of the current
23 beneficiary under the Deed of Trust. SAC, ¶ 5.
24     After the filing of the original action, in February, 2009, Plaintiffs, pursuant to the
25 express written request of Defendant Litton, and in exchange for a stipulated continuance of the
26 date for responsive pleading, presented to Defendant Litton a good faith offer to modify their
27 home loan on the basis of the "Net Present Value" Test required by the FDIC and under the terms
28 of the HAMP program. The Plaintiffs home had been severely reduced in value from its original

PRINTED ON
RECYCLED PAPER

valuation of $400,000, while their ARM had ballooned to 8.05% on a loan balance of approximately $350,000. Plaintiffs requested a new modified 3% fixed interest loan with an initial modified payment of $1,348 instead of the then current payment of $2,098.98, pursuant to the FDIC's and HAMP fair loan modification program. SAC, ¶ 6. Plaintiffs informed Litton that the financial hardship which had led to Plaintiffs falling behind in their payments was the very serious illness and eventual death of their son. Because of the refusal of Plaintiffs medical health insurance carrier to fully reimburse their son's medical expenses they were forced to spend all their savings, and to go into great debt, in a vain attempt to save their son's life. Plaintiffs spoke directly to the managing supervisor of the loan modification department of Litton. He agreed with them that the financial costs incurred by them as part of their vain efforts to keep their son alive clearly was a "hardship" under HAMP and the other programs utilized by Litton. SAC, ¶ 7.

Thereafter Plaintiffs complaint was consolidated and coordinated with another action in Orange County Superior Court, case number 30-2009-00116811, wherein Plaintiffs Charles Brown, Zita Zandoval, Gudrun Birch, James Krachmer, Petra Brito and Cynthia Krachmer were suing Defendant Litton for breach of contract. The consolidated actions were based upon common allegations relating to issues concerning the fraudulent and unconscionable origination of mortgage promissory notes and deeds of trust. SAC, ¶ 8. On May 1, 2009 the parties agreed to a stipulated stay of the consolidated actions to enable an attempt to resolve the disputes via settlement. The stipulation was made **in open court and on the record** before the Hon. Thierry Colaw of the Orange County Superior Court, the judge on the consolidated matters. SAC, ¶ 9.

Counsel for Litton, Roup & Associates, expressly stated on the record before the Hon. Thierry Colaw that the case was being stayed so that loan modifications could be finalized, since each of the Plaintiffs, including the Lesleys, had been approved for a loan modification by Litton. At that point Defendant Litton, sub-servicer for the main servicer, Bank of America, assumed a fiduciary duty to Plaintiffs to perform as promised and in good faith. *Id.* Each of the Plaintiffs, **other** than the Plaintiffs herein, were then provided a loan modification of 2 - 3%. For each Plaintiff granted a loan modification (after a successfully completed Three Month Trial Period) a

simple Settlement Agreement and Mutual Release was prepared by Defendants Litton's and Bank of America's counsel, Roup & Associates. The claims of the Plaintiffs therein were then voluntarily dismissed. SAC, ¶ 10.

Despite the earlier promises made to Plaintiffs, their counsel and to the court, on June 11, 2009 Defendant Litton (on behalf of itself and primary servicer Bank of America) informed Plaintiffs in writing that, despite what they had been told by Litton's managing agent for the Loan Modification Department, their son's death, and the enormous medical costs incurred by them in an attempt to save their son's life, was not a true "hardship" for Plaintiffs and simply insufficient for Defendant's purposes to allow a modification of the loan. On its face this statement was knowingly and intentionally false and directly contradicted by Litton's managing agent for the Loan Modification Department. SAC, ¶ 11. There was also no financial requirement for such conduct since a foreclosure on the property, which would render Plaintiffs homeless, would result in a **net loss** to the owner of the Note of over $300,000. SAC, ¶ 12.

Following discussions during July and August, 2009, between Plaintiffs' counsel and counsel for Litton, Litton agreed that the denial letter sent to Plaintiffs stating that their son's death was not a "true hardship" should never have been sent and that the death, and the enormous costs associated with trying to save their son's life, did amount to a true hardship. Counsel for Litton agreed to resubmit the loan modification application to her client with a recommendation that Litton approve it, as it had already agreed to and which she had confirmed in open court. SAC, ¶ 13. Plaintiffs prepared and provided all required documentation requested by Defendant Litton by October, 2009. For the next two and one half years Litton failed to do anything on the matter, other than to have their counsel on a monthly basis assure Plaintiff's counsel the matter was "under review" and "just about finalized". SAC, ¶ 14.

Eventually, on February 12, 2011 Litton, on behalf of Bank of America, National Association, granted Plaintiffs in writing a loan modification subject **only** to the payment of three trial modification payments beginning April, 1, 2011 through June 1, 2011. Litton agreed in writing that if such payments were made Plaintiffs would be granted a modification. Attached to the original complaint as Exhibit A is a true and correct copy of the loan modification agreement

- 7 -

signed by Litton's Counsel Joan Spaeder-Youngkin of Roup & Associates, a law firm. *Id.* The Loan Modification Agreement stated "Litton Loan Servicing LP ("Litton"), as sub-servicer of the above-referenced subject loan, has received the necessary authorization from Bank of America, the master servicer, **to proceed with a loan modification.** Provided Mr. and Mrs. Lesley make three trial modification payments of $1,900.37 due April 1, 2011, May 1, 2011, and June 1, 2011, and pursuant to such terms to be set forth in a release agreement re Mr. and Mrs. Lesley's claims, **a loan modification will follow**." The **sole** condition precedent to the Loan Modification for Plaintiffs was (a) three timely payments, and (b) "Mr. and Mrs. Lesley's approval." There is no dispute that the three payments were timely made and the approval was provided in writing. Plaintiffs therefore fulfilled their obligations under the Agreement. *Id.*

There is no ambiguity as to what the new loan would be. The Loan Modification Agreement sets forth in detail the financial component of the loan modification, that is, the new interest rate of 2.18% and the new payment amount of $1649.60 (P&I). The Loan Modification Agreement concluded "Please provide Mr. and Mrs. Lesley's approval so **we may prepare the documentation to memorialize the parties' agreement**." The letter is signed by Defendants counsel Joan Spaeder-Youngkin of Roup & Associates.

On February 15, 2011, Plaintiffs' counsel spoke with Ms. Spaeder-Youngkin. She confirmed the terms of the new loan were provided under HAMP. Plaintiff's counsel confirmed that Plaintiffs had authorized him to approve the Loan Modification and he informed her that the payments would be timely made. Plaintiff's counsel confirmed the approval the same day in writing. Ms. Spaeder-Youngkin agreed Defendants had to **and would** prepare a simple mutual release of claims to avoid any need for litigation and that she would do so "shortly". Counsel spoke again on February 16, 2011 and agreed that the "documentation to memorialize the parties' agreement" would be (a) a new loan and deed of trust to be prepared by Litton reflecting the new financial terms agreed upon in the Loan Modification Agreement and with all other terms remaining the same as the original Note and Deed of Trust, and (b) a settlement agreement and mutual release of claims. Counsel for both parties agreed that the settlement agreement and

|   |   |
|---|---|
| 1 | mutual release of claims would be on **precisely** the same terms as **already provided** for each of |
| 2 | the Plaintiffs in the earlier consolidated action by Defendants. The Release would specifically |
| 3 | and precisely follow the earlier Releases already signed, other than putting in Plaintiffs names, |
| 4 | address, loan number, and the new interest rate and new payment amount already identified. |
| 5 | Both counsel agreed that the Release should be finalized within a few weeks. SAC, ¶ 16. |
| 6 | As to Plaintiffs sole obligation under the Loan Modification Agreement, that is, to |
| 7 | timely make three period payments, Defendants have admitted in writing that Plaintiffs made |
| 8 | each of the trial loan payments timely and as required, and further made an additional payment in |
| 9 | July 1, 2011. SAC, ¶ 18. Thereafter, Defendants agreed in writing that future payments, at the |
| 10 | trial loan modification amount, could be held in trust until the loan modification documents were |
| 11 | finalized. They have been so held. *Id.* |
| 12 | Between March 2, 2011 and April 16, 2011 counsel for Plaintiffs on a weekly basis |
| 13 | wrote to Litton's counsel requesting the documents be finalized. These requests are in |
| 14 | writing. On every occasion Litton's counsel confirmed both that the loan modification had |
| 15 | been agreed and that she was "preparing the documents". She asked that counsel for |
| 16 | Plaintiffs wait until the three payments had been made. He agreed. SAC, ¶ 19. On May 27, |
| 17 | 2011, Counsel for Litton contacted Mr. Graham and informed him **in writing** that all |
| 18 | penalties and attorneys' fees added to the principal balance (almost $100,000) had been |
| 19 | **waived** by Litton. SAC, ¶ 20. |
| 20 | On July 1, 2011, after **four** payments had been timely made, Plaintiff's counsel |
| 21 | requested that counsel for Defendants "prepare the documentation to memorialize the |
| 22 | parties' agreement." Thereafter Plaintiff's counsel contacted by email Ms. Spaeder- |
| 23 | Youngkin demanding the final documents on July 7, 13, 14, 28, August 4, 9, 10, September |
| 24 | 1, 14, 25, October 5, 18, November 7, November 23, December 6, and 29, 2011, January 18, |
| 25 | 26, February 1 and 2, 2012. On every occasion Defendants counsel responded and agreed in |
| 26 | writing that she was "preparing" the necessary documentation, which in this case was a simple |
| 27 | settlement agreement with mutual releases and the new loan documents, which of course only |
| 28 | Defendants could draft. On a number of occasions Defendants, through counsel Joan Spaeder- |

Youngkin, beginning in mid-June, 2011 expressly stated in writing that Plaintiffs had been fully approved for and would be given a loan modification. Ms. Spaeder-Youngkin also stated that the necessary documents were being prepared and would be delivered "shortly". No such documents were ever delivered to Plaintiffs or their counsel. SAC, ¶ 21.

Under the Loan Modification Agreement, the **ONLY** stated requirements are (a) three timely payments by Plaintiffs, (b) approval of the agreement by Plaintiffs, and (c) preparation of a mutual release agreement by Defendants to be signed by the parties. Once approval was provided by Plaintiffs (on February 15, 2011) and the three timely payments were made, Defendants had the obligation to finalize the documents – **"we [will] prepare the documentation to memorialize the parties' agreement."** At that point the sole remaining condition was the preparation of the "documentation to memorialize the parties' agreement" which Defendants Litton and Bank of America had expressly agreed they would prepare. Defendants simply never did what they had agreed to do under the Agreement. *Id.*

On February 2, 2012 Counsel for Litton, Joan Spaeder-Youngkin informed Plaintiffs in writing that, as of September 1, 2011, "Litton was acquired by OCWEN Financial. We have been working with OCWEN in finalizing this modification." Counsel for Litton, Joan Spaeder-Youngkin of Roup & Associates, confirmed she had spoken with counsel for OCWEN and that the loan modification was in the process of being finalized. SAC, ¶ 22. Plaintiffs' counsel wrote to counsel for Litton on February 12, March 8 and 9, 2012, and received written confirmation that the documents were "prepared" and being finalized. *Id.*, at ¶ 23.

On March 24, 2012, Defendant OCWEN wrote, in a letter dated March 2, 2012, "Thank you for your application for a modification under the Making Homes Affordable Program. Based upon our review of the documentation you provided, you are not eligible for a Home Affordable Modification. We are unable to offer you a Home Affordable Modification because: **You did not make all of the required Trial Period Plan payments by the end of the trial period.**" SAC, ¶ 24. As is indisputable, the statement by Defendant OCWEN in the letter dated March 2, 2012 is knowingly and intentionally false. *Id.*, at ¶ 25.

1   Given that Defendants never prepared the final documentation of the modified loan,
2   despite agreeing to do so on innumerable occasions in writing over the course of two full years,
3   and given the simplicity of those final documents (which had already been prepared in the earlier
4   consolidated action), it is clear that Defendants Litton and Bank of America delayed finalizing
5   the loan modification in the hope that the property would regain some of its prior value over
6   those two years allowing them to renege on the contract and foreclose on the property in
7   violation of that contract. In so acting Defendants of course assumed that any court to whom
8   Plaintiffs sought recourse would be indifferent to Plaintiffs plight and act in favor of the banks,
9   despite the obvious tortious misconduct by successive banks. SAC, ¶ 25.

10   On March 28, 2012 Plaintiffs' counsel wrote to Ms. Spaeder-Youngkin sending her a
11   copy of the "Denial Letter" and demanding she resolve this problem. She agreed to discuss the
12   matter with OCWEN's new counsel. SAC, ¶ 26. On April 11, 2012, counsel for Defendant
13   OCWEN, Christopher Blevens, wrote to Plaintiffs counsel, Anthony Graham and stated "Mr.
14   Graham: I thought I would get the docs to you today. **I am awaiting one document myself to**
15   **finalize the loan modification agreement**. They will be out to you tomorrow. Thanks,
16   Christopher R. Blevins." SAC, ¶ 27.

17   On April 12, 2012, fourteen months after the Loan Modification Agreement, counsel for
18   OCWEN provided a new written "Modification Agreement" and, finally, a form of "Release".
19   **HOWEVER**, the documents wholly change the terms of the Loan Modification Agreement
20   provided to Plaintiffs in February 11, 2011 and approved February 15, 2011. Mr. Graham
21   responded on April 13, 2012 - "Dear Mr. Blevins, The proposed loan modification documents
22   are a year late and tens of thousands of dollars too much and wholly unacceptable. Your clients
23   have delayed this matter for over three full years in a case where they caused my clients
24   enormous emotional and financial distress. This loan modification "offer" actually
25   **INCREASES** the amount of the debt on the property to over $370,000 which is not only greater
26   than the amount cited in the trial mod package (which was itself too high) but also contains no
27   offset for payments already made by my clients. Additionally, the "debt" amount appears to
28   include almost $100,000 in penalties and fees caused by your own clients actions, and is

especially galling given the fact that the property value has fallen to no more than $100,000 over the last several years while your clients have "sat on their hands". Finally, the monthly payments are more than 400% over the initial payments due on the initial note (which was less than $800) and even more significantly is substantially higher than the trial loan modification payments." On April 13, 2012 Mr. Graham provided Mr. Blevins a copy of the February 11, 2011 Loan Modification Agreement and a history of the payments made and agreements reached – "Mr. Blevins, The actual amount of the loan (without penalties etc.) is approximately $300,000. The trial loan mod, principal and interest, was $1649.60 at 2.18%. The total amount paid to the servicer (Litton, though its counsel, Joan Spaeder Youngkin) was $7601.48 for the trial loan mod (which included a charge for insurance even though they had already privately paid for it.) Additionally, last May 27, 2011 Litton agreed in writing to waive all corporate advances (attorneys' fees) and penalties. Tony Graham." No response has ever been forthcoming from Defendant OCVWEN or its counsel. SAC, ¶ 28.

While Plaintiffs have waited for Defendants Litton, Bank of America and OCWEN to fulfill their contractual obligation to finalize the documentation for the loan modification the value of their home has dropped to less than $80,000. SAC, ¶ 29. Because Defendants have continued to report Plaintiffs payments as being not paid and that they are in default their credit ratings have been destroyed making the possibility of refinance or even moving out of the home into rented accommodation impossible. The value of their home, which could have been sold five years ago, prior to the recession and collapse in its value, was over $300,000 and could have been sold at that time at a profit. Because of the unconscionable 5 year delay by Defendants the home is now, essentially worthless, with a "market" value of less than $80,000, assuming a buyer could even be found. SAC, ¶ 30.

Additionally, Defendants, despite the unconscionable delays being solely their fault have increased the amount of the alleged debt by over $72,000, including late fees and penalties, which would not have been imposed if Defendants had acted timely and in good faith and had provided the final documentation for the loan modification. It need hardly be added that

1  OCWEN's demand for payment of this amount is unlawful since Litton had already waived in
2  writing those fees and penalties, a fact known to OCWEN and its counsel. SAC, ¶ 31.
3       Plaintiffs have suffered intense emotional distress due to the initial callous refusal to
4  grant a loan modification on the grounds that the loss of their son, coupled with the enormous
5  financial strain of trying to keep him alive in the face of their health insurers refusal to provide
6  coverage, was somehow an "insufficient hardship" to qualify for a loan modification. Plaintiffs
7  severe emotional distress has been exacerbated by the extraordinary and inexcusable four year
8  delay in granting a loan modification, a period during which the value of the home declined
9  precipitously to a current value of less than $100,000 and Plaintiffs credit rating fell from 720 to
10  less than 450. SAC, ¶ 32-33.

## III. ARGUMENT

Defendants make three arguments in support of their demurrer. Each is equally unavailing.

### A. Plaintiffs Have Alleged Valid Contract Claims.

Defendants state that "plaintiff has not provided evidence of a mutually agreed upon contract that represents a sufficient meeting of the minds between parties on all points." Motion, p. 1. Wrong. Every term of the agreement is set forth in detail in the complaint, as well as the mutual obligations of the parties. Plaintiffs were provided, as part of a settlement of their earlier action, a Trial Loan Modification Agreement signed by the attorney for Defendant Litton. Plaintiffs Verified Second Amended Complaint ("SAC"), ¶¶ 13-22 and Exh. A thereto. Defendants promised in writing that once Plaintiffs had fully complied with the terms of the Agreement they would be provided a loan modification on the same terms. SAC, ¶13. The written Trial Loan Modification Agreement **expressly** states as follows:

> Litton Loan Servicing LP ("Litton"), as sub-servicer of the above-referenced subject loan, **has received** the necessary authorization from Bank of America, the master servicer, **to proceed with a loan modification**. Provided Mr. and Mrs. Lesley make three trial modification payments of $1,900.37 due April 1, 2011, May 1, 2011, and June 1, 2011, and pursuant to such terms to be set forth in a release agreement re Mr. and Mrs. Lesley's

claims, **a loan modification will follow**. [emphasis added]

There is no ambiguity as to what the new loan would be. "The Loan Modification Agreement sets forth in detail the financial component of the loan modification, that is, the new interest rate of 2.18% and the new payment amount of $1649.60 (P&I). The Loan Modification Agreement concluded "Please provide Mr. and Mrs. Lesley's approval so **we may prepare the documentation to memorialize the parties' agreement**." The letter is signed by Defendants counsel Joan Spaeder-Youngkin of Roup & Associates." SAC, ¶15. Plaintiffs provided written approval of the agreement on February 15, 2011. *Id.* That same day "Ms. Spaeder-Youngkin [counsel for Defendants] agreed **Defendants had to and would** prepare a simple mutual release of claims to avoid any need for litigation and that she would do so "shortly"." *Id.* It is undisputed that Plaintiffs made the necessary trial payments and maintained further payments in trust, as agreed by Defendants. *Id.*, at ¶17-18. This fulfilled Plaintiffs conditions precedent to finalization of the Loan Modification Agreement. The Trial Loan Modification states that "Once trial modification payments are made, **the modification can be finalized**." SAC, Exh. A, p. 1.

All that remained to be done was the agreed preparation **by Defendants** of a release in the form already used for the four prior Plaintiffs with whom Defendants had settled. "Counsel spoke again on February 16, 2011 and agreed that the "documentation to memorialize the parties' agreement" would be (a) a new loan and deed of trust to be prepared by Litton reflecting the new financial terms agreed upon in the Loan Modification Agreement and with all other terms remaining the same as the original Note and Deed of Trust, and (b) a settlement agreement and mutual release of claims. **Counsel for both parties agreed that the settlement agreement and mutual release of claims would be on precisely the same terms as already provided for each of the Plaintiffs in the earlier consolidated action by Defendants. The Release would specifically and precisely follow the earlier Releases already signed**, other than putting in Plaintiffs names, address, loan number, and the new interest rate and new payment amount already identified. **Both counsel agreed that the Release should be finalized within a few weeks**." SAC, ¶16 [emphasis added].

As set forth in detail in the SAC, it has been Defendants failure to complete its obligation under the agreement to provide the simple release and loan documents. "Between March 2, 2011 and April 16, 2011 counsel for Plaintiffs on a weekly basis wrote to Litton's counsel requesting the documents be finalized. These requests are in writing. On every occasion Litton's counsel confirmed both that the loan modification had been agreed and that she was "preparing the documents". She asked that counsel for Plaintiffs wait until the three payments had been made. He agreed." SAC, ¶19. "On May 27, 2011, Counsel for Litton contacted Mr. Graham and informed him **in writing** that all penalties and attorneys' fees added to the principal balance (almost $100,000) had been **waived** by Litton." *Id.*, ¶20. "On July 1, 2011, after **four** payments had been timely made, Plaintiff's counsel requested that counsel for Defendants "prepare the documentation to memorialize the parties' agreement." Thereafter Plaintiff's counsel contacted by email Ms. Spaeder-Youngkin demanding the final documents on July 7, 13, 14, 28, August 4, 9, 10, September 1, 14, 25, October 5, 18, November 7, November 23, December 6, and 29, 2011, January 18, 26, February 1 and 2, 2012. On every occasion Defendants Litton's and Bank of America's counsel, Joan Spaeder-Youngkin of Roup & Associates, responded and agreed in writing that she was "preparing" the necessary documentation, which in this case was a simple settlement agreement with mutual releases and the new loan documents, which of course **only Defendants could draft**." *Id.*, ¶21.

Under the Loan Modification Agreement, the **ONLY** stated requirements are (a) three timely payments by Plaintiffs, (b) approval of the agreement by Plaintiffs, and (c) preparation of a mutual release agreement by Defendants to be signed by the parties. Once approval was provided by Plaintiffs (on February 15, 2011) and the three timely payments were made, Defendants had the obligation to finalize the documents – "**we [will] prepare the documentation to memorialize the parties' agreement**." At that point the sole remaining condition was the preparation of the "documentation to memorialize the parties' agreement" which Defendants Litton and Bank of America had expressly agreed they would prepare. Defendants simply never did what they had agreed to do under the Agreement.

These undisputed allegations adequately set forth a cause of action for breach of contract and breach of the implied covenant. As such they also adequately ground Plaintiffs UCL claims.

### B. Plaintiffs Have Set Forth A Valid UCL Claim.

As noted above, since Plaintiffs have made the necessary allegations concerning their contract claims, they have validly set forth UCL claims. *Krantz v. BT Visual Images* (2001) 89 Cal.App.4th 164, 178 (the viability of an "unlawful" UCL claim "stands or falls" with the underlying claim); *Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718 (stating that where a plaintiff can state a claim under the "borrowed" law, plaintiff can state a UCL claim).

Contrary to Defendants assertions, Plaintiffs have sufficiently alleged a fraudulent business practice, in that the offering of a loan modification without the intent to ever complete, while requiring the ongoing payment of a false "trial period" plan, amounts to a violation of Business & Professions Code section 17200. "A practice is "fraudulent" if members of the public are likely to be deceived. *Committee on Children's Television, Inc. v. Gen'l Foods Corp.* 35 Cal.3d 197, 211 (1983). In addition, as to any statutory violation, Plaintiffs can allege there was and currently is an ongoing violation of the California Home Owners Bill of Rights. Further, the conduct described in the complaint clearly amounts to "immoral, unethical, oppressive [or] unscrupulous" conduct.

### C. Plaintiffs Allege Valid Intentional and Negligent Infliction of Emotional Distress Claims.

As to Plaintiff emotional distress claims, Defendants casually state that "Plaintiffs claim is solely based on a denial of a mortgage modification." Mot., p. 10. Actually, it is not the denial, but the manner in which Defendant informed a grieving mother that her dead child's death was of no consequence and was not "a hardship" which forms the basis of the claim.

Further, Defendants assert that they have no duty to Plaintiffs and therefore cannot be liable for negligent infliction of emotional distress for telling the parents of a dead child that the loss of that child, and the enormous financial burdens imposed on the parents by his illness, is not a "sufficient hardship" to qualify for a loan modification. Mot., pp. 10-11. Defendants simply ignore the fact that they accepted a duty to in good faith evaluate Plaintiffs for a loan modification when they so stipulated before the Hon. Thierry Colaw in open court. SAC, ¶ 9.

A bank cannot hide behind a general rule relating to the usual banking relationship when it has chosen to act in a manner so contrary to basic human decency as to offend the conscience and has done so after stipulating to the duty to act in good faith and breaching it by denying the loan modification in bad faith, refusing to accept the hardship suffered by Plaintiffs as sufficient. The conduct is even more egregious when viewed in light of the fact that Defendant Litton's own supervising officer for the loan modification department "agreed with them that the financial costs incurred by them as part of their vain efforts to keep their son alive clearly was a 'hardship' under HAMP and the other programs utilized by Litton." SAC, ¶ 7. [1] [2] As a simple review of the SAC makes abundantly clear, the emotional distress is **not related** to any of the contractual issues but to the extraordinarily callous treatment received by the parents of a dead child.

---

[1] As to the assertion (Mot., p. 10) that somehow the statute of limitations applies, the earlier action contained the same claim and was dismissed pursuant to a stipulation to permit Defendants time to adequately assess Plaintiffs situation and provide a reasonable loan modification. SAC, ¶ 9. It would be unreasonable to find that Defendants can now rely on their own breach of that stipulation to avoid liability for the emotional distress they caused.

[2] As to Defendants assertion that Plaintiffs "loss" in this regard is purely the result of a default on their loan obligation (Mot., p. 9) reflects an almost unconscionable misstatement of what Plaintiffs have alleged. They do not seek damages under their Distress claims for the breach of the Trial Loan Agreement, but for the emotional devastation their outrageous conduct inevitably caused.

Defendants also state that Plaintiffs "do not allege that defendants knew they were especially vulnerable or used a position of power to cause the plaintiffs' emotional distress." Motion, p. 10. Wrong. Plaintiffs state that Defendants knew they were grieving parents. Even this court should agree this made Plaintiffs especially vulnerable, by definition. As to whether Defendants were "in a position of power", and thus enabled to cause Plaintiff's emotional distress – Plaintiffs had just lost their child and the bank was telling them they were also going to lose their home because his death and the enormous costs associated with Plaintiffs efforts to keep him alive, were irrelevant and "did not amount to a hardship." It is hard to imagine a more cruel and malicious action, taken with full knowledge of all the facts.

Under these circumstances, Plaintiffs have sufficiently alleged Defendants knew of their extreme vulnerability, were in a position of extraordinary power at the time and intentionally caused Plaintiffs severe emotional distress when they falsely claimed that the death of Plaintiffs' child was not a hardship.

### D. CONCLUSION

Based on the foregoing, Plaintiffs respectfully request this court deny the Motion, or alternatively, if the court believes it necessary, give Plaintiffs leave to amend.

Dated: June 3, 2013

GRAHAM & MARTIN LLP

_____
Anthony G. Graham
Attorneys for Plaintiffs